**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Stacey Widlund

    v.                                                    Civil No. 11-cv-371-JL

Michael J. Astrue, Commissioner,
Social Security Administration


**REPORT AND RECOMMENDATION**


Pursuant to 42 U.S.C. § 405(g), Stacey Widlund moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons that follow, I recommend that the decision of the Commissioner, as announced by the Administrative Law Judge ("ALJ"), be affirmed.


**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB decisions); see also 42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of review for SSI decisions). However, the court "must uphold a denial of social security . . . benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the

evidence is for the [Commissioner], not the courts." <u>Irlanda</u>
<u>Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir 1991)
(citations omitted).  Moreover, the court "must uphold the
[Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529,
535 (1st Cir. 1988).  Finally, when determining whether a
decision of the Commissioner is supported by substantial
evidence, the court must "review[] the evidence in the record as
a whole." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting <u>Rodriguez v.</u>
<u>Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).


## Background

The parties have submitted a Joint Statement of Material
Facts, document no. 11.  That statement is part of the court's
record and will be summarized here, rather than repeated in
full.

Widlund last worked in November of 2006, when she was
discharged from a position in a medical office.  According to
her employer, she was discharged for not taking constructive
criticism, for being inflexible, for expressing a disinclination
to improve her job performance, and for being insubordinate and
rude.  <u>See</u> Administrative Transcript ("Tr.") 248.  In her
Disability Report, she said she left that job "[d]ue to [her]

3

conditions," Tr. 184, which she described as "[d]egenerative disc disease in back, herniated disc, and pinched nerves."  Id.

Before she worked in the medical office, Widlund was employed by four different restaurants as a server.  Discerning precisely why Widlund left any of her jobs is no easy task.  In her Disability Report, she appears to indicate that she left all of them because of her back condition.  See Tr. 184. Specifically, she: (1) said she left those jobs because she could not perform her job duties, see Tr. 184; (2) identified her back impairment as the only condition that limited her ability to work, see id.; and (3) denied having ever been "seen by a doctor/hospital/clinic or anyone else for emotional or mental problems that limit[ed] her ability to work."[1]  See Tr. 186.  Yet, at her hearing, Widlund said that she had been fired from every job she had ever had for insubordination or having a bad attitude.[2]  See Tr. 34.  But, in her application for her job in the medical office, she said she had left her four previous

---

[1] As it happens, the record includes counseling records going back to 2004.  See Tr. 620.  The existence of those records suggests either a lack of candor on Widlund's part when she was completing her Disability Report or that she did not consider the emotional or mental problems for which she received counseling to be serious enough to limit her ability to work.

[2] When she left Fratello's Ristorante Italiano in 2002 after four years, the owner wrote a letter that characterized her as "flexible," "a team player," "a model employee with regard to work ethic and personality," and as someone who "gets along with everyone."  Tr. 230.

hospitality jobs because of the hours (JW Hills), to take maternity leave (Margarita's Restaurant), for personal reasons (Fratello's), and because she moved from the area (Balsam's Resort).  At the very least, Widlund's multiple descriptions of her work history present a bit of a moving target.

In 2004, Widlund injured her back when she fell off the icy steps of a bus.  Diagnostic imaging of her back has revealed: (1) an L5-S1 left-sided disc herniation that appeared to contact the left S1 nerve root; (2) a large central disc protrusion at L5-S1, a moderately large disc protrusion at L2-L3, and small to moderate disc protrusions at L3-L4 and L4-L5; (3) a central disc herniation at L4-L5 with midline mass effect and leftward disk herniation at L4-5; and (4) mild discogenic changes at L3-L4 through L5-S1, with no focal nerve root compression.  She has been diagnosed with chronic lumbar back pain, left sacroiliac radiculopathy, L5 radiculopathy, and degenerative disc disease at multiple levels of the lumbar spine.[3]  The treatment Widlund has been prescribed for her back condition includes: (1) back exercises; (2) hot/cold compresses; (3) interlaminar lumbar epidural steroid injections; (3) transforaminal left L2-L3 epidural steroid injections; (4)

---

[3] The physician who made that diagnosis stated that Widlund had "degenerative disc disease which [was] out of proportion for what [he] would expect for a person of her age."  Tr. 489.  He determined that the etiology of Widlund's degenerative disc disease was unclear, but that it was probably genetic.  See id.

physical therapy; and (5) medication, including Vicodin, Darvocet, Flexeril, Ultram, Naprosyn, Tramadol, Naproxen, Advil, Neurontin, Lidoderm, and Robaxin.

Widlund's participation in physical therapy has been minimal, and the record includes comments from two of her treating sources noting her failure to follow through on their recommendations that she pursue that mode of treatment.  When pressed to participate in physical therapy, Widlund's most frequent response has been to point out her lack of transportation and child care, but in October of 2006, she told her physiatrist, Dr. Robert Deters, that she had not begun physical therapy because "she [did] not think it [was] going to help."  Tr. 493.  Dr. Deters described the aftermath:

> I explained to Stacey that I have made multiple suggestions [that she engage in physical therapy] which she has not followed through on.  I am not sure that I can help her if she continues not to follow through with suggestions.  At that point, the patient became angry and stated she did not feel like she was being taken seriously and requested that we give her her records.

Tr. 493-94.

Widlund has also been diagnosed with chronic morbid obesity and hyperthyroidism.  She is five feet six inches tall and has weighed as much as 290 pounds.  Her hyperthyroidism has been treated with medication.  In addition, Widlund had a gastric band put in place which was later surgically converted to a

gastric bypass.  Those procedures initially resulted in a weight loss of about 100 pounds, but Widlund has regained about half the weight she lost.

Since 2004, Widlund has received treatment for depression and anxiety.  Her diagnoses include: (1) major depressive disorder, recurrent, severe without psychotic features; (2) personality disorder, not otherwise specified; (3) adjustment disorder; and (4) major depressive disorder with bipolar features.  Her treatment has consisted of mental-health counseling, psychotherapy, and the following medications: Seroquel, Effexor, Abilify, Lexapro, and Buspar.

In November of 2007, Dr. Laura Fry, Widlund's primary-care physician, completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on Widlund.[4]  See Tr. 585-88. In terms of exertional limitations, Dr. Fry determined that Widlund: (1) could lift/carry less than ten pounds; (2) needed to be able to shift from sitting to standing/walking at will; (3) needed to take unscheduled breaks during the work day; (4) could sit for twenty minutes at a time and for a total of two hours in an eight-hour day; (5) could stand and walk for ten

---

[4] Given that Widlund applied for SSA benefits in January of 2009, see Tr. 7, it is not clear why Dr. Fry would have completed such a form in 2007.  The date on the form could plausibly be read as either "2007" or "2009," but because the Joint Statement of Material Facts says the form was completed in 2007, the court follows suit.

minutes at a time and for a total of ninety minutes in an eight-hour day; and (6) could sit, stand, or walk for a total of four hours in an eight-hour day.  Dr. Fry also opined that for every thirty minutes of activity, Widlund would need to take a break and elevate her feet for twenty minutes.  In terms of postural activities, Dr. Fry opined that Widlund could climb stairs and ramps for less than two hours in an eight-hour day but could never climb ladders or scaffolds, balance, stoop, crouch, kneel, or crawl.  She also found various environmental limitations.  Dr. Fry also indicated that Widlund's physical impairments (or treatment for those impairments) would cause her to be absent from work more than three times a month.  Finally, Dr. Fry stated that the limitations she identified had been present since November of 2006.

Between August of 2007 and February of 2011, Dr. Fry completed at least eight physical capacity forms on Widlund for the New Hampshire Department of Health and Human Services, Division of Family Assistance ("DFA").  See Tr. 684-701.  None of those forms indicate a capacity for full-time work.  They do, however, indicate the following specific capacities: (1) an ability to sit, stand, and walk for no more than one hour each in an eight-hour work day (Aug. 2007); (2) a complete inability to sit, stand, or walk in (Jan. 2009); (3) an ability to sit, stand, and walk for less than one hour each in an eight-hour

work day in (Aug. 2009); (4) an ability to sit for no more than two hours, stand for no more than one hour, and walk for no more than one hour in an eight-hour work day (Jan. 2010); and (5) an ability to sit, stand, and walk for no more than one hour each in an eight-hour work day (Feb. 2011).

In May of 2009, state-agency consultant Dr. Burton Nault completed a Physical Residual Functional Capacity ("RFC") Assessment on Widlund.  See Tr. 506-13.  In the area of exertional limitations, he determined that Widlund had the capacity to: (1) lift less than ten pounds frequently and ten pounds occasionally; (2) stand and/or walk (with normal breaks) for less than two hours in an eight-hour work day; (3) sit (with normal breaks) for about six hours in an eight-hour work day; and (4) push and/or pull with no limitation other than the limitation on her ability to lift and/or carry.  In rating Widlund's capacity for sitting, Dr. Nault did not check the box indicating a need to "periodically alternate sitting and standing to relieve pain or discomfort."  Tr. 507.  With respect to postural limitations, Dr. Nault determined that Widlund was able to occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  He found no manipulative, visual, communicative, or environmental limitations.

In June of 2009, at the request of the Social Security

Administration, Dr. Lorene Sipes performed a psychological consultive examination of Widlund, and completed a Mental Health Evaluation Report on her.  See Tr. 514-18.  Dr. Sipes reported her opinions that Widlund had: (1) minimal limitations or no limitations in the area of activities of daily living; (2) some limitations in the area of social functioning, but still functioned satisfactorily; (3) some limitations in the area of understanding and remembering instructions, but generally functioned well; (4) some limitations in the area of concentration and task completion, but generally functioned well; and (5) some limitations in the area of reaction to stress and adaptation to work or work-like situations, but still functioned satisfactorily.  Dr. Sipes gave the following prognosis: "Widlund reported symptoms of Depression which research has demonstrated to be effectively treatable.  She reportedly takes medication as prescribed and has attended therapeutic services in the past.  Thus, it is my clinical opinion that her prognosis is good."  Tr. 517.  Dr. Sipes concluded with the following recommendations:

> Widlund provided a coherent history and was able to effectively articulate sufficient [illegible] information to render a diagnosis and suggest effective treatment strategies.  Thus, her symptom presentation does not suggest the need for further assessment/testing.  She would likely benefit from medication management and individual therapy.

Tr. 518.

In September of 2009, state-agency consultant Dr. J. Coyle
completed a Mental Residual Functional Capacity Assessment on
Widlund.  See Tr. 581-84.  In the summary conclusion section of
the form he filled out, Dr. Coyle indicated moderate limitations
in six of the twenty listed functional abilities[5] and no
significant limitations in the remaining fourteen.  He then gave
the following assessment:

> Cl[aiman]t's allegations regarding her depression and
> the impact on her functioning are generally credible.
> She has issues managing her anger and [she]
> consequently limits her social interactions.  Stress
> adaptation is also noted to be somewhat limited;
> cl[aiman]t benefits from external support and ongoing
> psychosocial intervention.  While severe, limitations
> do not exceed the moderate range of impairment in any
> critical area of functioning.  Intell[igence] is
> est[imated] as [average], and
> att[entio]n/conc[entration] are generally good.
>
> MER supports the following [mental residual functional
> capacity]:
>
> Cl[aiman]t can understand and remember 2 to 3 step
> instructions of a routine nature.
>
> Cl[aiman]t can sustain att[entio]n/conc[entration] for
> routine tasks of a nonsocial nature and maintain

---

[5] Specifically, Dr. Coyle found Widlund to be moderately
limited in her abilities to: (1) work in coordination with or
proximity to others without being distracted by them; (2)
complete a normal work day and work week without interruptions
from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of
rest periods; (3) interact appropriately with the general
public; (4) accept instructions and respond appropriately to
criticism from supervisors; (5) get along with coworkers or
peers without distracting them or exhibiting behavioral
extremes; and (6) respond appropriately to changes in the work
setting.  See Tr. 581-82.

effort for extended periods of time over the course of a normal work day/week within acceptable pace and persistence standards.

Cl[aiman]t is capable of brief superficial interactions with the general public.  She can participate in typical interactions with coworkers and supervisors while completing routine tasks of a nonsocial nature.  She is able to maintain adequate personal grooming and hygiene.

Cl[aiman]t is able to adapt to minor changes in routine.  She is capable of independent goal directed behavior while completing routine tasks.  She is aware of typical hazards.  She can travel independently.

Tr. 583.

In the fall of 2010, Widlund began treating with Dr. Sipes, who had previously authored the mental-health evaluation described above.  The record does not include any treatment notes from Dr. Sipes.[6]  In December of 2010, Dr. Sipes completed a Mental Residual Functional Capacity Questionnaire on Widlund. See Tr. 592-97.  Dr. Sipes indicated a diagnosis of major depression and a current GAF score of 61-65.[7]  In the area of

_____

[6] In her memorandum of law, Widlund acknowledges that "[t]hese records were submitted but inadvertently omitted from the record."  Doc. no. 8-1, at 16 n.2.  She did not, however, attach those records to her memorandum, nor does she suggest that she has attempted to have them submitted to the court as an addendum to the Administrative Transcript.

[7] "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning.'"  Nickerson v. Astrue, No. 1:11-cv-87-GZS, 2012 WL 975641, at *2 n.2 (D. Me. Mar. 21, 2012) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-VI-TR) 32 (4th ed. 2000).  A GAF score of 61 to 70 indicates: "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some**

mental abilities and aptitudes needed to do unskilled work, Dr.

Sipes opined that Widlund was unable to meet competitive

standards in four of the sixteen listed abilities,[8] and was

seriously limited, but not precluded, in five more abilities.

The form directed Dr. Sipes to briefly explain any assessments

of: (1) inability to meet competitive standards; or (2) serious

limitation.  She made several such assessments, but did not

provide the requested explanations.  In the area of mental

abilities and aptitudes needed to so semiskilled and skilled

work, Dr. Sipes opined that Widlund was unable to meet

competitive standards in two of the four listed abilities,[9] and

was seriously limited, but not precluded, in the remaining two

abilities.  Again, Dr. Sipes did not explain those assessments.

---

**difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**  DSM-IV-TR, supra, at 34 (emphasis in the original).

[8] Specifically, Dr. Sipes opined that Widlund lacked the ability to meet competitive standards with regard to: (1) maintaining regular attendance and being punctual within customary, usually strict tolerances; (2) completing a normal work day and work week without interruptions from psychologically based symptoms; (3) performing at a consistent pace without an unreasonable number and length of rest periods; and (4) dealing with normal work stress.

[9] Specifically, Dr. Sipes opined that Widlund lacked the ability to meet competitive standards with regard to: (1) setting realistic goals and making plans independently of others; and (2) dealing with the stress of semiskilled and skilled work.

After assessing Widlund's functional abilities, Dr. Sipes opined
that her mental impairments (or treatment for those impairments)
would cause her to miss three days of work per month, and would
preclude her from working fifty weeks per year, forty hours per
week, five days a week, and eight hours a day.  Finally,
notwithstanding the fact that Dr. Sipes first met Widlund in
2009, she opined that Widlund had suffered from the limitations
described in the questionnaire since 2004.

     At Widlund's hearing, the ALJ took testimony from a
vocational expert ("VE") to whom she posed a hypothetical
question that posited a person with the physical abilities found
by Dr. Nault and the mental abilities found by Dr. Coyle.[10]  The
VE testified that such a person would not be capable of
performing Widlund's past relevant work, but would be able to
perform several other jobs.  Widlund's counsel then posed
hypothetical questions positing limitations from Dr. Sipes's
2010 Mental RFC Questionnaire.  According to the VE, several of
those limitations would preclude employment, as would an
inability to sit for more than two hours in an eight-hour
workday and a need for a twenty-minute break after every thirty
minutes of work.  After the hearing, the ALJ issued a decision

---

[10] The ALJ did leave out one of Dr. Coyle's mental
limitations, but for reasons explained later in this Report and
Recommendation, that omission is inconsequential.

that includes the following relevant findings of fact and
conclusions of law:

    3.  The claimant has the following severe impairments:
    degenerative disc disease, obesity, and depression
    syndrome (20 CFR 404.1520(c) and 416.920(c)).

    . . . .

    4.  The claimant does not have an impairment or
    combination of impairments that meets or medically
    equals one of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
    404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    . . . .

    5.  After careful consideration of the entire record,
    the undersigned finds that the claimant has the
    residual functional capacity to perform sedentary work
    as defined in 20 CFR 404.1567(a) and 416.967(a) except
    she can occasionally lift and carry up to 10 pounds.
    She can frequently lift and carry up to 5 pounds.  The
    claimant is able to stand and/or walk for between 2
    and 3 hours, and can sit for about 6 hours during an
    8-hour workday with normal breaks.  She can
    occasionally climb, balance, stoop, knee[l], crouch,
    and crawl.  She can understand and remember two to 3-
    step instructions of a routine nature, and can
    tolerate occasional and brief superficial interactions
    with the public.  The claimant can participate in
    typical interactions with coworkers and supervisors
    while completing routine tasks of a nonsocial nature.
    She can adapt to minor changes in a routine and is
    capable of independent goal-directed behavior while
    completing routine tasks.

    . . . .

    6.  The claimant is unable to perform any past
    relevant work (20 CFR 404.1565 and 416.965).

    . . . .

    10.  Considering the claimant's age, education, work
    experience, and residual functional capacity, there

are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 10, 12, 17, 18.  Based on the testimony of the VE, the ALJ found that Widlund could work as a data-examination clerk, as a cashier, as an addressor, and as an order clerk.

## Discussion

According to Widlund, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) did not properly credit her allegations of disabling pain; (2) did not properly assess the opinions of her health-care providers; and (3) ascribed her an RFC that is not supported by substantial evidence.

### A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The only question in this case is whether Widlund was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A)

(setting out a similar definition of disability for determining

eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if [her] physical or mental impairment
> or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which [she] lives, or whether a specific job vacancy
> exists for [her], or whether [she] would be hired if
> [she] applied for work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

To decide whether a claimant is disabled for the purpose of

determining eligibility for either DIB or SSI benefits, an ALJ

is required to employ a five-step process.  See 20 C.F.R. §§

404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is

granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that she is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

[i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the [claimant] or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

B. Widlund's Arguments

Widlund argues that the ALJ's decision should be reversed because the ALJ: (1) did not give controlling weight to Dr. Fry's opinions on the limiting effects of her back impairment; (2) did not give controlling weight to Dr. Sipes's opinions on

18

the limiting effect of her mental impairment; (3) failed to properly credit her statements about the limiting effects of her back pain and the symptoms of her mental impairments; and (4) formulated an RFC that is not supported by substantial evidence. The court begins with Widlund's arguments about the ALJ's consideration of the medical opinions, continues with Widlund's credibility argument, and concludes with her challenge to the ALJ's RFC assessment.

### 1. Medical Opinions

The same legal principles apply to the ALJ's consideration of the opinions of both Dr. Fry and Dr. Sipes.  Accordingly, the court starts by outlining those principles and then discusses the ALJ's consideration of each of the two opinions at issue.

### a. Legal Principles

The Commissioner and, by extension, an ALJ, must consider and evaluate all the medical opinions in a claimant's case record.  See 20 C.F.R. §§ 404.1527(b) & (d) and 416.927(b) & (d).  The relevant regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant'] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's]

19

physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 416.927(c)(2).

The Commissioner must give "controlling weight" to the opinion of a treating source if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). But, "[i]f any of the evidence in [a claimant's] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the Commissioner] will weigh all of the evidence." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). As a general matter, the Commissioner gives more weight to opinions from examining sources than to opinions from non-examining sources, and the greatest weight of all to opinions from treating sources. See 20 C.F.R. §§ 404.1527(d) and 416.927(d). When determining how much weight to give the opinion of a treating source, the Commissioner must consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence the medical source presents in support of his or her opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6)

other factors which tend to support or contradict the opinion.
See 20 C.F.R. §§ 404.1527(d) and 416.927(d).

No matter what determination the Commissioner makes
regarding the weight to be given a treating source's opinion,
the Commissioner must "always give good reasons in [his] notice
of . . . decision for the weight [he gives a claimant's]
treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2) and
416.927(d)(2).  "Giving 'good reasons' means providing 'specific
reasons' that will allow 'subsequent reviewers [to know] . . .
the weight the adjudicator gave to the treating source's medical
opinion and the reasons for that weight.'"  Kenerson v. Astrue,
No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011)
(quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188,
at *5 (S.S.A. 1996)).  Not only must the adjudicator's reasons
be specific, they must also be supportable, see Soto—Cedeño v.
Astrue, 380 F. App'x 1, 4 (1st Cir. 2010), and offer a rationale
that could be accepted by a reasonable mind, see Lema v. Astrue,
C.A. No. 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21,
2011).

### b. Dr. Fry's Opinions

Dr. Fry has been Widlund's primary-care physician since
2005.  She has opined on multiple occasions that Widlund's back
impairment prevents her from sitting for more than an hour or

two in an eight-hour work day, a limitation that would preclude

employment.  The ALJ, however, gave those opinions little

weight.  See Tr. 15.  In so doing, she explained that Dr. Fry's

opinions for the DFA "do not appear to have been based on a

physical exam or functional capacity testing," id., and then

elaborated:

> These opinions are given little weight, as they are
> highly inconsistent with the clinical evidence on
> record.  As discussed above, straight leg raise
> testing was consistently negative over the course of
> the relevant period, and the claimant is noted to
> exhibit full strength as well as normal sensation in
> her extremities.  Dr. Fry's own notes indicate normal
> gait and station and also medical noncompliance with
> physical therapy.  There are little to no other
> physical findings within Dr. Fry's [notes], as it
> appears that she never performed a full
> musculoskeletal examination of the claimant.  Further,
> in 2008, Dr. Fry informed the claimant that it was her
> opinion that the claimant "can and should" return to
> work.  This is certainly not reflected in the signed
> opinion evidence, as they appear to be based only on
> the claimant's self-reported limitations.

Tr. 15-16 (citations to the record omitted).  Widlund argues

that the ALJ erred by failing to give controlling weight to Dr.

Fry's opinions.  Widlund is mistaken.

As a preliminary matter, the ALJ more than fulfilled her

obligation to provide specific reasons for assigning little

weight to Dr. Fry's opinions.  See Kenerson, 2010 WL 1981609, at

*4.  Moreover, those reasons are both supportable and

reasonable.  See Soto-Cedeño, 380 F. App'x at 4; Lema, 2001 WL

1155195, at *4.

The ALJ began by identifying and relying on various forms of clinical evidence, such as negative straight-leg raising tests[11] and observations confirming full strength and normal sensation in the extremities along with normal gait and station. While Widlund criticizes the ALJ for referring to those data, on grounds that a lay factfinder is not qualified to interpret raw medical data, her argument is unfounded.  The case on which she relies, Rivera v. Commissioner of Social Security, 181 F.3d 80 (unpublished table decision), 1998 WL 1085690 (1st Cir. Dec. 9, 1998), indeed stands for the proposition that "as a lay factfinder, an ALJ lacks sufficient expertise to interpret [raw medical] data," id. at *1 (citing Rivera-Figueroa v. Sec'y of HHS, 858 F.2d 48, 52 (1st Cir. 1988) (per curiam); Berrios v. Sec'y of HHS, 796 F.2d 574, 576 (1st Cir. 1986) (per curiam)). But the issue in Rivera was whether an ALJ could craft an RFC from raw medical data, without the benefit of a medical-source opinion, see 1998 WL 1085690, at *1, not whether an ALJ is

---

[11] Regarding straight-leg raising tests, the record includes the following results: (1) painful bilaterally (April 2005), see Tr. 369; (2) mildly positive (May 2005), see Tr. 486; (3) negative (Aug. 2006), see Tr. 489; (4) negative (March 2007), see Tr. 321; (5) negative (May 2007), see Tr. 326; and (6) "Straight leg-raises are positive for reproduction of buttock symptoms sitting, but are not positive supine" (June 2007), see Tr. 330.  Widlund appears to identify the June 2007 results as a basis for criticizing the ALJ's reliance on Widlund's negative straight-leg raising test results.  But, it is for the ALJ to weight the evidence, not a reviewing court.  See Irlanda Ortiz, 955 F.2d at 769.

allowed to compare a medical-source opinion with a claimant's

medical records, to determine whether the opinion is consistent

with those records.

As Magistrate Judge Bowler explained in a case from the

District of Massachusetts:

> "The law in this circuit does not require the ALJ
> to give greater weight to the opinions of treating
> physicians." Arroyo v. Secretary of Health and Human
> Services, 932 F.2d 82, 89 (1st Cir. 1991); accord
> Keating v. Secretary of Health and Human Services, 848
> F.2d 271, 276 (1st Cir. 1988) ("treating physician's
> conclusions regarding total disability may be rejected
> by the Secretary especially when, as here,
> contradictory medical advisor evidence appears in the
> record"). . . . The relevant regulations further
> permit the ALJ to downplay the weight afforded a
> treating physician's assessment of the nature and
> severity of an impairment where, as here, it is
> internally inconsistent or inconsistent with other
> evidence in the record including treatment notes and
> evaluations by examining and nonexamining physicians.
> 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4).

Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004).

Arruda plainly supports the idea that an ALJ may consider

medical evidence when weighing a medical opinion.

In another case from the District of Massachusetts,

Magistrate Judge Sorokin was faced with a situation similar to

the one presented here:

> Tessier alleges that the ALJ committed an error
> of law in discrediting the opinion of his treating
> physician, Dr. Blanchette. . . .
>
> The ALJ found that Dr. Blanchette's opinion was
> inconsistent with the weight of the evidence, and that
> Dr. Blanchette's "opinion as to [Tessier's]

limitations [was] also unsupported by his own
treatment records."   Indeed, Dr. Blanchette's
treatment records from the same day indicate that
Tessier had a normal physical.  Dr. Blanchette's form
notes the following: "joints—no swelling, redness, nl
[normal] ROM [range of motion];" "neuro—nl [normal]
sensation, motor, reflexes;" "vascular—periph[eral]
pulses;" and "appearance—well developed, well
nourished."  These treatment notes, which describe
Tessier as a generally healthy individual, clearly
contradict Dr. Blanchette's opinion regarding
Tessier's limitations, as given in the Medical Source
Statement.

Tessier v. Astrue, No. 10-cv-11944-LTS, 2012 WL 931156, at *7

(D. Mass. Mar. 20, 2012) (citations to the record omitted).

Like the ALJ in Arruda, the ALJ in Tessier examined and relied

on medical evidence when weighing a medical opinion.

Based on Arruda and Tessier, the ALJ in this case did not

err by using medical evidence to help her determine how much

weight to give Dr. Fry's opinions.  As in Tessier, the ALJ in

this case supportably determined that clinical observations

reported in Dr. Fry's office notes undercut her opinions

concerning Widlund's physical capacities.  Because the ALJ was

entitled to consider medical evidence from Dr. Fry (and

Widlund's other providers) when evaluating Dr. Fry's opinions,

and because those opinions were inconsistent with both Dr. Fry's

own office notes and other medical evidence, the ALJ was

justified in declining to give Dr. Fry's opinions controlling

weight.

She was also justified in giving those opinions relatively little weight.  The so-called "treating-physician rule" is premised on the idea that it is appropriate to "give more weight to opinions from . . . treating sources, since these sources are the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  Accordingly, when determining how much weight to give a treating-source opinion, the Commissioner (and the ALJ) are directed to consider the nature and extent of the treatment relationship.  See 20 C.F.R. §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  The ALJ did just that when she noted the paucity of physical findings in Dr. Fry's notes and the lack of a full musculoskeletal examination.

The record contains yet more compelling evidence that the limited nature and extent of Dr. Fry's treatment relationship with Widlund counsels against giving substantial weight to her opinions.  During the time when Dr. Fry was providing the opinions that Widlund says the ALJ erred by discounting, the most frequent "chief complaint" listed in Dr. Fry's office notes is some version of "forms" or "paperwork."  See Tr. 463 (Aug. 15, 2007), 451 (Feb. 20, 2008), 448 (July 8, 2008), 439 (Jan. 27, 2009), 661 (Aug. 26, 2009), 664 (Nov. 11, 2009), 666 (Mar. 1, 2010), 668 (Aug. 27, 2010).  Those office notes describe little if any examination or treatment directed to Widlund's

back condition.  Having stated the general proposition, the court turns to several specific examples.

On August 15, 2007, Dr. Fry opined, on a DFA disability form, that Widlund could sit, stand, and walk for no more than one hour each in an eight-hour work day.  See Tr. 684.  Then, somewhat confusingly, Dr. Fry said Widlund was capable of performing sedentary work, but could do so for zero hours per day.  See id.  She also opined that Widlund's condition did not allow either full or partial participation in work-related activities.  See id. at 685.

On that same day, Dr. Fry memorialized her visit with Widlund in an office note.  That note lists Widlund's chief complaint, and the reason for her visit, as "forms," Tr. 463, and describes the history of Widlund's present illness as "Needs forms filled out," id.  The part of the office note labeled "OBJECTIVE" states, in full:

> General appearance: well developed, well hydrated, no acute distress
>
> Mental Status Exam
> Judgment, insight: intact
> Mood and affect: no depression, anxiety, or agitation

Id.  Finally, under the heading "Assessment & Plan / Impression & Plan Summary," Dr. Fry wrote: "BACK PAIN, LUMBAR, CHRONIC.  Forms filled out.  Told patient that my expectation is moving toward recovery and improved conditioning."  Id.  The August

2007 office visit was the first of four or five where Widlund went to Dr. Fry primarily to get DFA disability forms filled out, and got those forms filled out without receiving any appreciable treatment and, at best, a limited examination.[12]

Not only do Dr. Fry's office notes call into question the significance of her treatment relationship with Widlund as a basis for her opinions, those notes also call into question the validity of the opinions themselves.  For example, in the "Assessment & Plan" section of Fry's February 20, 2008, office note, generated after another office visit focusing on paperwork, Dr. Fry wrote:

> I filled out paperwork as best I could, but have told her that a brief visit to do a form with so much detail is unrealistic.  It is my opinion that she can and should go back to work or some training, and I have expressed that opinion to her.  Will decline further disability paperwork in future.

Tr. 452.  Given Dr. Fry's observation about her limited ability to complete the form(s) Widlund brought in, it is not surprising that she presented next to no evidence in support of her February 2008 opinion, either on the DFA form itself[13] or in her

---

[12] Typically those notes list Widlund's height, weight, body mass index, and blood pressure, but few other examination results.  See Tr. 449, 452, 662, 669.

[13] Dr. Fry included very little narrative description or explanation in any of the DFA forms she filled out.  Dr. Nault, in contrast, provided nearly a full page of additional comments explaining the basis of his opinion on Widlund's physical RFC. See Tr. 513.

contemporaneous office note.[14]  The lack of supporting evidence

diminishes the weight to which Dr. Fry's opinion is entitled.

See 20 C.F.R. §§ 404.1527(d) and 416.927(d).

Notwithstanding her threat to do so, Dr. Fry did not

decline further disability paperwork for Widlund.  Rather, after

filling out several more DFA disability forms, Dr. Fry wrote, in

the "Assessment & Plan" section of her November 18, 2009, office

note:

---

[14] The closest Dr. Fry came to presenting evidence is in the
"history of present illness" section of her office note:

> Discuss back issue/ Paperwork.  P[atien]t is still
> having the pain, constant.
> She needs [primary care physician] to fill some form
> out given to her. . . .
> Has paperwork a about work issues
> Patient has had stomach banding done, and has lost
> some weight, but still has much to go and is working
> with that clinic about it.
> Back pain, she says, continues to prevent her from
> working or proper training.

Tr. 451 (emphasis added).  That is not the first office note in
which Dr. Fry reported a statement from Widlund that she could
not work.  In January of 2007, shortly after Widlund was fired
from her last job, Dr. Fry described her "history of present
illness" as: "work issues, wants letter.  [S]ays she can't have
consistent work with her back spasms."  Tr. 472.  Similarly, in
July of 2008, Dr. Fry reported Widlund's statement that "her
back is such that she cannot be reliable for work, because when
it goes out, she cannot work."  Tr. 448.
    Of course, Widlund's opinion about her capacity for work is
beside the point; what matters is the independent informed
opinion of a medical expert.  In any event, it seems fairly
evident that from 2007 on, with respect to her back condition,
Widlund regarded Dr. Fry more as a source of determinations that
she was disabled than as a source of medical treatment.

> BACK PAIN, LUMBAR, CHRONIC.  paperwork filled out
> according to what she tells me she can do at this
> point in time.  I have told her firmly that I do not
> support her disability claim, and that I believe she
> needs to get stronger and work toward back
> strengthening, by small amounts of walking and
> increasing time.

Tr. 664-65.  On February 11, 2011, Dr. Fry wrote a letter to

whom it may concern, clarifying that "at the time [she wrote the

November 18, 2009, office note, she] did not support full

disability, but clearly understood that [Widlund] was unable to

work a full schedule."  Tr. 703.  But, the real issue with Dr.

Fry's office note is not whether Dr. Fry supported Widlund's

disability claim; it is Dr. Fry's admission that she filled out

the DFA form essentially by taking dictation from Widlund.  That

is a big problem, given that a treating physician's report of a

claimant's subjective complaints does not transform those

complaints into either objective medical findings, see Craig v.

Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996), or treating-

physician opinions entitled to deference, see Reeves v.

Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003).  Indeed,

"[a]n ALJ may reject a treating physician's opinion if it is

based 'to a large extent' on a claimant's self-reports that have

been properly discounted as incredible."  Tommasetti v. Astrue,

533 F.3d 1035, 1041 (9th Cir. 2008) (citing Morgan v. Comm'r of

Soc. Sec., 169 F.3d 595, 602) (9th Cir. 1999); Fair v. Bowen,

885 F.2d 597, 605 (9th Cir. 1989)).

Here, the ALJ's reasons for giving little weight to Dr. Fry's opinions constitute a "rationale that could be accepted by a reasonable mind."  <u>Lema</u>, 2011 WL 1155195, at *4.  At the time Dr. Fry was giving those opinions, she was providing little if any treatment to Widlund for the conditions that, in her opinion, rendered Widlund incapable of working.  She does not even seem to have done much in the way of examination or testing.  Thus, as the ALJ stated, Dr. Fry's opinion was inconsistent with the clinical evidence.  Moreover, Dr. Fry's office notes clearly demonstrate both the limitations she faced in completing the forms Widlund brought her and her reliance on Widlund's subjective reports, rather than her own medical analysis and judgment, which the ALJ also noted.  In sum, the ALJ committed no error by declining to give controlling weight to Dr. Fry's opinions, and by choosing to significantly discount them.

### c. Dr. Sipes's Opinion

Dr. Sipes provided a mental-health evaluation of Widlund in June of 2009,[15] began treating her in the fall of 2010,[16] and

---

[15] That evaluation includes a substantial amount of narrative explanation for the opinions stated therein.

[16] The Administrative Transcript includes no treatment records from Dr. Sipes, making it impossible to evaluate the length, nature, and extent of her treatment relationship with Widlund.  Beyond that, Dr. Sipes's questionnaire refers to an examination of Widlund, but includes no description of the

completed a Mental RFC Questionnaire in December of 2010.[17]   The

2010 questionnaire indicates substantially greater limitations

than the 2009 evaluation.   The ALJ, however, gave greater weight

to Dr. Sipes's 2009 evaluation than she gave to her 2010

questionnaire.   See Tr. 16-17.   The ALJ explained:

> This opinion [i.e., the opinion in Dr. Sipes's 2010
> questionnaire] is given extremely limited weight, as
> it is internally inconsistent as well as blatantly
> inconsistent with Dr. Sipes['s] own opinion from 2009.
> First, this opinion is internally inconsistent given
> the GAF score found on the first page, indicating that
> the claimant was functioning between 61 to 65 at the
> time of the opinion.   A GAF score in the mid 60's is
> certainly not indicative of the inability to deal with
> stress, pace, attendance, and goal setting.   Next, Dr.
> Sipes noted much less severe limitations after her
> 2009 examination, which was conducted prior to a
> treatment relationship being established.   . . .
> These two opinions are highly inconsistent with one
> another, with one [noting] almost no ability to work,
> and the other noting the ability to function at least
> satisfactorily in all categories.   Certainly, the
> expressed limitations cannot date back to 2004, if her
> functioning was noted to be much higher in 2009.   It
> should also be noted that Dr. Sipes has no personal
> knowledge of the claimant's functioning prior to 2009.
> Finally, Dr. Sipes'[s] 2010 opinion is also
> inconsistent with the claimant's counseling note[s]

---

examination and no discussion of any findings that may have
resulting from it.   Rather, the questionnaire gives the
impression that Dr. Sipes relied largely on Widlund's "self-
report of personal history + summary of previous therapist."
Tr. 592.   Based on the record, it may be somewhat generous to
characterize Dr. Sipes as a treating source.

[17] As the court has already noted, Dr. Sipes declined to
provide the narrative explanations requested by the form and, in
fact, the opinions stated therein consist of little more than
checks in boxes.   In contrast, Dr. Coyle concluded his Mental
RFC Assessment with a relatively lengthy narrative description
and explanation.   See Tr. 583.

from that period.  As discussed above, they
consistently describe the claimant as pleasant,
bright, animated, and calm; and also consistently
describe her GAF score as remaining in the 60's.  As
such, the claimant's counseling notes from the entire
period as well as her presentation at the hearing are
far more consistent with Dr. Sipes'[s] opinion from
2009.  Based on the foregoing, the 2009 opinion is
given more weight than the 2010 opinion, which is
given almost no weight.

Tr. 16-17 (citation to the record omitted).  The ALJ's

conclusion is also bolstered by the fact that Dr. Sipes

incorporated much more evidentiary support into her 2009 opinion

than she put into her 2010 opinion.  See 20 C.F.R. §§

404.1527(d)(2)(iii) and 416.927(d)(2)(iii).

As with Dr. Fry's opinion, the ALJ fulfilled her obligation

to provide specific reasons for giving Dr. Sipes's 2010 opinion

the limited amount of weight she gave it.  See Kenerson, 2010 WL

1981609, at *8.  And, given the divergence between Dr. Sipes's

2010 opinion and both her better-supported 2009 opinion and Dr.

Coyle's well-supported opinion, the ALJ was not obligated to

give controlling weight to Dr. Sipes's 2010 opinion.  See 20

C.F.R. §§ 404.1527(d) and 416.927(d).  Thus, the only question

is whether the ALJ gave a rationale for discounting Dr. Sipes's

2010 opinion "that could be accepted by a reasonable mind."

Lema, 2011 WL 1155195, at *4.  She did.

The ALJ pointed out several compelling reasons for

discounting Dr. Sipes's second opinion.  First, the internal

33

inconsistency is jarring.  The GAF score Dr. Sipes reported is
significantly at odds with her opinion.  Then, there is the
matter of overreaching.  As the ALJ pointed out, Dr. Sipes
offered an opinion that covered a time period beginning five
years before she ever met Widlund.  That would be bad enough,
but, as the ALJ also noted, the 2010 opinion posited a
substantial inability to work from 2004 through 2010, despite
Dr. Sipes's having opined in 2009 that Widlund's mental
limitations were relatively mild.  There could be a perfectly
good explanation for that inconsistency.  Such an explanation
would be most meaningful coming from Dr. Sipes, but her 2010
questionnaire does not even acknowledge her 2009 evaluation,
much less explain why her opinion changed so much in such a
short time.  Moreover, as noted above, Dr. Sipes consistently
declined to explain her opinions on the form she filled out,
despite the form's instructions directing her to do so.  Without
any explanation or evidentiary support recorded on the form, and
without any treatment records from Dr. Sipes, her 2010 opinion
is not very well supported by the record.  See 20 C.F.R. §§
404.1527(d) and 416.927(d).  Accordingly, the ALJ committed no
error by giving it very little weight.

<u>2. Symptoms</u>

Widlund also argues that the ALJ improperly determined that her allegations about pain and the symptoms of her depression and anxiety were not supported by the objective medical evidence.  She further argues that even if the ALJ was correct on that point, she made an incorrect credibility assessment. The Commissioner disagrees, categorically.  The court begins by outlining the relevant law and then turns to Widlund's arguments.

<u>a. Legal Principles</u>

According to SSR 96-7p, "an individual's statement(s) about his or her symptoms is not in itself enough to establish the existence of a physical or mental impairment or that the individual is disabled."  1996 WL 374186, at *2 (S.S.A. 1996). "A symptom is an individual's own description of his or her physical or mental impairment(s)."  <u>Id.</u>  When "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness," <u>id.</u>, are alleged, SSR 96-7p prescribes the following evaluation process:

> * First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms. . . .  If there is no medically determinable physical or mental

impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

* Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-78, 1996 WL 374186, at *2. In addition:

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.  In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

    1. The individual's daily activities;

    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3.  In this circuit, the seven considerations listed above are commonly referred to as "the Avery factors."

     SSR 96-7p outlines a specific staged inquiry that consists of the following questions, in the following order: (1) does the claimant have an underlying impairment that could produce the symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?  See Baker v. Astrue, Civ. No. 08-11812-RGS, 2010 WL 3191452, at *8 (D. Mass. Aug. 11, 2010) ("If after evaluating the objective findings, the ALJ determines that the claimant's reports of symptoms are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must then consider other relevant

information."); Callie v. Comm'r of Soc. Sec., Civ. No. 09-1305, 2010 WL 1424725, at *3) (D.P.R. Apr. 6, 2010) (explaining that "before weigh[ing] the credibility of a claimant's statements about pain . . . [the] ALJ must first find a lack of support in the objective medical evidence for the allegations of pain").

Finally, an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (emphasis added).  Stated a different way, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  Id.

### b. Support for Widlund's Allegations

As noted, Widlund first asserts that "her allegations of pain and symptoms of depression and anxiety are supported by the objective medical evidence."  Cl.'s Mem. of Law (doc. no. 8-1), at 2.  In her actual argument, however, she addresses only her allegations of pain.  In so doing, she identifies various pieces of objective medical evidence that, in her view, support her

allegations of pain.  The Commissioner, in turn, identifies the objective medical evidence specifically identified by the ALJ as supporting her determination that Widlund's allegations of pain were not credible.  Widlund responds by accusing the ALJ of impermissibly interpreting raw medical data.

As a preliminary matter, Widlund's argument that the ALJ impermissibly interpreted raw medical data is unavailing.  As in the context of evaluating medical opinions, an ALJ assessing a claimant's statements about symptoms is not merely entitled to consider objective medical evidence, but is obligated to do so.  See SSR 96-7p, 1996 WL 374186, at *2.  What an ALJ cannot do, and what the ALJ in this case did not do, is to formulate an RFC from raw medical evidence.  See Rivera, 1998 WL 1085690, at *1.  To restate, the ALJ did not err by looking to the medical evidence of record to determine that Widlund's allegations of disabling pain were not fully supported by objective medical evidence.

That said, the court turns to the evidence both sides have adduced on this issue.  Widlund points to various impressions, diagnoses, and results of imaging studies showing, for example, that she had a broad-based central disc herniation, left SI radiculopathy, and other back conditions.  That evidence is certainly sufficient to establish that Widlund had "an underlying medically determinable physical . . . impairment

39

. . . that could reasonably be expected to produce [her] pain." SSR 96-7p, 1996 WL 374186, at *2.  The ALJ made exactly that finding.

Having made that finding, the ALJ was then obligated to determine whether Widlund's statements about pain were "substantiated by objective medical evidence."  SSR 96-7p, 1996 WL 374186, at *2.  In other words, after determining, as a general matter, that a broad-based central disc herniation could reasonably be expected to produce the pain Widlund claimed, the ALJ needed to determine whether there was objective medical evidence that Widlund's broad-based central disc herniation actually caused the amount of pain she alleged.  The objective medical evidence the ALJ adduced, i.e., longitudinally consistent medical findings of normal gait, the ability to heel and toe walk bilaterally, and normal strength in the extremities, speak directly to that issue and constitute substantial evidence that Widlund's allegations of totally disabling back pain were not fully substantiated by the objective medical evidence.  Because the ALJ committed no error in determining that Widlund's allegations about her pain were not fully substantiated, it was entirely appropriate for her to proceed to assess Widlund's credibility.

Because the court has determined that it was appropriate for the ALJ to consider the credibility of Widlund's allegations

concerning back pain, and because Widlund herself does not seriously challenge the propriety of the ALJ's consideration of her allegations concerning the symptoms of depression and anxiety, the court considers, in turn, Widlund's allegations concerning the symptoms of her mental impairments and the limiting effects of her back pain.

### c. Allegations Concerning Mental Impairments

The ALJ rejected Widlund's "allegations regarding angry outbursts and severe difficulty getting along with others," Tr. 14, and also rejected her "allegations regarding limitations in memory, attention, and concentration," id. The ALJ gave specific reasons for rejecting each set of allegations and went on to note that Widlund's activities of daily living were inconsistent with both the mental and physical symptoms she alleged. Finally, the ALJ devoted considerable attention to the testimony that began Widlund's hearing, which consisted of Widlund's attempts to disavow no fewer than seven different statements in her application materials, based on her allegation, at the hearing, that she had not properly understood some of the questions. Widlund devotes most of her attention to the ALJ's concerns with the inconsistency of her testimony, but

also presents some evidence to counter the evidence adduced by
the ALJ in support of her decision to discount Widlund's
allegations concerning the limiting effects of the symptoms
caused by mental impairments.  The Commissioner has the better
argument.  In the balance of this section, the court follows the
parties' lead by first considering the inconsistency issue, and
then turns to Widlund's specific allegations concerning: (1) her
anger and inability to get along with people; and (2) her
problems with memory, attention, and of concentration.

## 1. Inconsistency

At her hearing, Widlund attempted to walk away from her
previous statements that: (1) her only impairments were physical
(she later alleged a mental impairment); (2) she lived alone
(she later admitted to living with her daughter); (3) she did
housework and yard work for "as long as it takes" (she later
alleged that she takes frequent breaks while performing those
tasks); (4) she was able to shop for an hour at a time (she
later alleged that she was only able to shop for a total of one
hour per week, spread across several shopping trips); (5) she
was able to pursue various hobbies (she later alleged that she
could not); (6) she could pay attention for a unlimited amount

of time (she later alleged that she could not);[18] and (7) she could follow written and spoken instructions "very well" (she later alleged that she could not).  At the hearing, she explained that many of the statements she wanted to disavow resulted from responding to questions she did not properly understand at the time she answered them.

Indeed, the most compelling argument against the credibility of Widlund's statements is their vast inconsistency. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p, 1996 WL 374186, at *5.  For that reason, SSR 96-7p directs the adjudicator to "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record," id., and to "look at statements the individual made to SSA at each prior step of the administrative review process," id.  At the same time, the adjudicator must also

---

[18] During the hearing, the following exchange took place between Widlund and her counsel:

Q And it says you pay attention for an unlimited amount of time.  What do you consider unlimited?

A Short amount of time.  I wasn't thinking that it was a long period of time.

Tr. 32.  Widlund's testimony speaks for itself.

"determine whether there are any explanations for any variations
in the individual's statements about symptoms and their
effects."  Id.

    With regard to the symptoms of her mental impairments,
Widlund now says she had/has substantial difficulty with
attention, concentration, and focus.  But, as noted above, in a
Function Report she filled out herself, she told SSA she
continued to pursue her hobbies, could pay attention for an
"unlimited" amount of time, and was able to follow written and
spoken instructions "very well."  Tr. 209.   The inconsistency
between Widlund's current allegations and her prior statements
appropriately caught the attention of the ALJ.  She, in turn,
expressly stated that the clarity of Widlund's responses to the
questions on the Function Report caused her to reject Widlund's
explanation for the inconsistency, i.e., that she was confused
or misled by the questions in the Function Report.  Based on its
own review those questions, and Widlund's responses, the court
cannot fault the ALJ for being unpersuaded by Widlund's
contention that the form was confusing.  Beyond that, Widlund's
testimony at the hearing that she used the word "unlimited" to
denote a "short amount of time" and her testimony that she was
too embarrassed to admit that she had trouble following

44

instructions[19] are beyond belief.  In sum, the inconsistences in Widlund's statements about the effects of her mental impairments gave the ALJ a reasonable basis to doubt the credibility of the statements on which Widlund now seeks to rely, and the ALJ plainly fulfilled her obligation to explain her responses to Widlund's inconsistencies, and her decision not to credit Widlund's statements.  See 96-7p, 1996 WL 374186, at *2.

The court concludes this section by noting that the inconsistency in Widlund's statements to SSA and others about the reasons she left various jobs is striking, and not at all helpful to her credibility.  She gave her final employer, the medical practice, specific reasons why she left each of her four previous jobs in the hospitality industry.  Then, in her Disability Report, she said she left all of her previous jobs, including the one in the medical office, because of her back condition, and affirmatively stated that she had never received treatment for emotional or mental problems that limited her

---

[19] That explanation rings somewhat hollow in light of the fact that later in her Function Report, Widlund admitted to having been fired from three jobs because she had problems getting along with people, see Tr. 210, an admission that could be viewed as at least somewhat embarrassing.  That "admission," of course leads to problems of its own, as it is inconsistent with various other statements Widlund made about the circumstances under which she left those jobs, and is highly inconsistent with the glowing recommendation of her interpersonal skills given by an employer whom, she says, terminated her because of her inability to get along with people.

ability to work.  See Tr. 184, 186.  At her hearing, however,
Widlund testified that she had left all of her previous jobs as
a result of the symptoms of her mental impairments.  The
multiple inconsistencies in Widlund's statements about the
reasons why she left her various jobs is substantial evidence
supporting the ALJ's decision to find Widlund's statements about
the limiting effects of her mental impairments to lack
credibility.

### 2. Anger

In explaining her decision not to credit Widlund's
allegations about anger and an inability to get along with
people, the ALJ cited: (1) descriptions of the claimant by her
health-care providers as "bright, cheerful, calm, social, and
cooperative," Tr. 14; (2) her own observations of Widlund at the
hearing; (3) two notes by Widlund's treating physician that
indicated no depression, anxiety, or agitation; (4) evidence
that Widlund's mental impairments were treated with a relatively
consistent regimen of medication throughout the entire period at
issue; and (5) evidence that Widlund experienced no side effects
from her mental-health medications.  Those explanations, with
record citations, more than satisfy the ALJ's obligation to
provide specific reasons for her credibility determination.  See
SSR 96-7p, 1996 WL 374186, at *2.

Widlund responds primarily by pointing to other evidence in the record demonstrating that she has had various angry outbursts.  Widlund's hearing included the following testimony about her anger issues:

> A I've seen a therapist since this [losing her job at the medical office] has all occurred.  And I've come to the realization that I have difficulty realizing my part in what happens.  And I just generally don't get along well with people.
>
> Q Well, now that you understand that, does that mean that the issue is corrected?
>
> A No, that's very difficult, I think, to change.
>
> Q have you had any instances or examples of how that's continued through, until today?
>
> A Until today, I still get into arguments and disagreements with people, just in my daily life. Like, if I go to the store, and things like that, I'll start –
>
> Q What happens when you go the store?
>
> A Sometimes I'll argue with them about what I believe is right, price-wise, and things like that.
>
> Q And who turns out to be right?
>
> A Of course, they're right, at the end of it.  But I'll still argue about it.
>
> Q So, now that you know that that's a problem, have you made any headway in correcting it?
>
> A Not as of yet.  I'm still working with a therapist named Laurie Sipes [phonetic].

Tr. 35-36.  Based on her own testimony, Widlund's anger appears to drift perilously close to the line between mental illness and

volitional unpleasant behavior.  And, while Dr. Sipes's treatment notes might shed some useful light on this issue, they have not been included in the record.  In any event, the ALJ committed no reversible error by declining to be persuaded by the testimony quoted above.

The bottom line is this: because it is the ALJ's responsibility to resolve conflicts in the evidence, see Irlanda Ortiz, 955 F.2d at 769, Widlund's ability to muster evidence that runs counter to that adduced by the ALJ is of no moment. In sum, the ALJ has identified substantial evidence supporting her decision not to credit Widlund's statements that she is disabled from working by her anger and/or her inability to get along with other people.

### 3. Attention, Memory, and Concentration

In deciding not to credit Widlund's statements about difficulties with attention, memory, and concentration, the ALJ cited: (1) test results indicating that Widlund's memory was intact; (2) her ability to complete her training as a medical assistant during the relevant period; (3) observations by medical professionals that her attention and concentration were good; (4) her ability to give a detailed medical history; and (5) GAF scores in the 60s.  The ALJ has plainly satisfied her obligation to explain the reasons for her credibility assessment on the issue of attention, memory, and concentration.  See 96-

7p, 1996 WL 374186, at *2.  Again, Widlund responds primarily by pointing to other evidence in the record that, in her view, better demonstrates her actual capacity for attention, concentration, and memory.[20]  But, as with the anger issue, because it is the ALJ's responsibility to resolve conflicts in the evidence, see Irlanda Ortiz, 955 F.2d at 769, Widlund's ability to identify evidence that contradicts the evidence on which the ALJ relied provides no basis for reversing the ALJ's decision.  In sum, the ALJ has identified substantial evidence supporting her decision not to credit Widlund's statements that she is disabled from working by problems with attention, memory, and concentration.

### d. Allegations of Disabling Back Pain

The ALJ also rejected Widlund's allegations of disabling back pain.  She did so in reliance on Widlund's failure to engage in physical therapy, her general reliance on non-narcotic pain medication, and her activities of daily living.  According to Widlund, the ALJ erred by: (1) failing to take into account her valid reasons for avoiding physical therapy, i.e., her lack of transportation and child care; (2) failing to take into

---

[20] Widlund also criticizes the ALJ for relying on: (1) the results of a Mini Mental Status Exam, which she says is an inapplicable test; and (2) her vocational training, which concluded before she claims to have become disabled.  Because those are only two of many pieces of evidence on which the ALJ relied, Widlund's criticisms, even if completely valid, do not carry the day.

account her valid reasons for avoiding narcotic medications and her current use of them; and (3) drawing unreasonable conclusions from her activities of daily living.

SSR 96-7p establishes that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the [claimant] is not following the treatment as prescribed and there are no good reasons for this failure." 1996 WL 374186, at *7. At the same time, however, an adjudicator "must not draw any inferences about [a claimant]'s symptoms and their functional effects from a failure to . . . pursue regular medical treatment without first considering any explanations that the [claimant] may provide." Id.

As with her statements about the symptoms of her mental impairments, Widlund presented the ALJ with a moving target in the form of multiple statements, and now claims that the ALJ erred by basing her decision on statements she made that are less favorable to her claim rather than relying on other statements she made that are more favorable. The ALJ committed no error.

The ALJ observed in her decision that both Dr. Deters and Dr. Fry reported that Widlund had failed to comply with their recommendations that she engage in physical therapy. Dr. Deters first made such an observation in November of 2005, see Tr. 495,

and Dr. Fry made a similar observation in July of 2008, <u>see</u> Tr.
449.  Dr. Deters's notes also document: (1) a statement by
Widlund that she intended to attend physical therapy at a
facility near her home, <u>i.e.</u>, Elliot Hospital, <u>see</u> Tr. 491; and
(2) two different explanations from Widlund for not attending
physical therapy, <u>i.e.</u>, logistical issues (lack of
transportation and lack child care), and her belief that
physical therapy would not help, <u>see</u> Tr. 493.  When asked to
explain Dr. Deters' observations, at her hearing, the following
exchange ensued:

> Q Okay.  Now, Dr. Dieter's [phonetic] says he's made
> many suggestions and you failed to follow through.
> What are the many suggestions he made that you didn't
> follow through on?
>
> A The many suggestions?  The only thing I can think of
> is that he did recommend that I went back to physical
> therapy.  And I did tell him that it was not working
> for me.  I was in more pain than it was doing any
> good.
>
> Q So did you actually go to physical therapy?
>
> A Yes, I did.
>
> Q Do you remember when?
>
> A Off the top of my head, no, I don't remember the
> dates.
>
> Q Do you remember where?
>
> A It was, it was affiliated with Elliott.  I think
> it's called "Elliott Rehabilitation," maybe?
>
> Q And did you go there many times?

A I believe I went there two, three, four times maybe?
Yeah.

Q And you say it made you worse?

A Yes.  I was in more pain afterward than anything, so
I just didn't go anymore.

Tr. 40-41.  So, at her hearing, Widlund did not say that she
failed to pursue physical therapy because of logistical issues;
she said that she did go to physical therapy, but found that it
did help her.

In her opinion, the ALJ said nothing about the
transportation and child-care issues Widlund reported to Dr.
Deters, but did note Widlund's statement to Dr. Deters that she
did not think that physical therapy would work for her.  Then
the ALJ pointed out that notwithstanding Widlund's testimony
that she attended physical therapy at Elliot, there was no
evidence of any such treatment in the record.[21]

Widlund's argument that the ALJ erred by failing to
consider her inability to pursue physical therapy for logistical
reasons is not persuasive.  Widlund herself did not offer that
explanation at the hearing; rather than saying that she did not
go to physical therapy, she said she did, but found it
ineffective.  The ALJ merely followed Widlund's lead, and then

---

[21] The Commissioner points out that when Elliot Hospital was
asked for Widlund's treatment records, it responded by stating
that it had "no records for the dates or type of treatment you
are requesting."  Tr. 505.

found her testimony to be unsupported by the record.  Widlund's
current position, that her medical records do not document her
physical therapy because she attended physical therapy prior to
her alleged onset date is even less persuasive.  Widlund's
alleged onset date is the date on which she fell off the icy
steps of a bus.  Widlund's unilateral determination that
physical therapy would not be an effective treatment for her
2004 injury, if based on her pre-injury experience with physical
therapy, is not a good reason for deciding not to comply with
Dr. Deters' repeated recommendations of physical therapy.

In sum, Widlund's allegations of disabling back pain are
permeated by the same kinds of inconsistencies that caused the
ALJ, permissibly, to deem her statements about mental-health
symptoms not to be credible.  In her application for benefits,
she said she left all her previous jobs because of back pain,
yet at her hearing, she said she left them because of the
symptoms of her mental impairment.  She gave Dr. Deters two
different explanations for her failure to pursue physical
therapy, then indicated that she had solved the logistical issue
by saying she would go to Elliot Hospital for physical therapy
(but never followed through).  At her hearing, she did not say
she could not or did not attend physical therapy, but said that
she did.  Those inconsistencies are substantial evidence
supporting the ALJ's determination that Widlund's statements

about the limiting effects of her back pain lacked credibility.
See SSR 96-7p, 1996 WL 374186, at *5.

### 3. The ALJ's RFC

Widlund concludes her memorandum with a discussion that
purports to be an argument that the ALJ ascribed her an RFC that
is not supported by substantial evidence.  Approximately five
pages of that argument appear to be directed toward the ALJ's
negative assessment of the credibility of Widlund's statements
about the symptoms of her mental impairments.  The court,
however, has already determined that the ALJ permissibly
discounted the credibility of those statements.  Beyond that,
Widlund's argument amounts to little more than asking the court
to reweigh the evidence the ALJ considered when she made her RFC
determination, but it is well settled that weighing the evidence
is the job of the ALJ, not the court.  See Irlanda Ortiz, 955
F.2d 769.

All that remains, then, of Widlund's third argument are
these assertions: (1) there is no substantial evidence in the
record to support the mental RFC the ALJ incorporated into her
hypothetical question to the ALJ; and (2) the ALJ failed to
incorporate various limitations posited by Drs. Coyle, Sipes,
and Fry into her RFC.  Regarding Widlund's first assertion,
there is substantial evidence in the record to support the ALJ's

mental RFC: Dr. Coyle's narrative functional capacity assessment, which the ALJ recited almost verbatim (with one exception) when posing her hypothetical question to the VE.  See Tr. 54-55, 583.  Under the circumstances of this case, Dr. Coyle's functional capacity assessment, which is largely in line with Dr. Sipes's 2009 opinion, counts as substantial evidence. See Berrios Lopez v. Sec'y of HHS, 951 F.2d 427, 431 (1st Cir. 1991) (explaining that a report from a non-testifying, non-examining medical source can be substantial evidence supporting an ALJ's decision); see also Tremblay v. Sec'y of HHS, 676 F.2d 11, 13 (1st Cir. 1982).  Widlund's contention that the ALJ was required to incorporate the limitations found by Dr. Sipes and Dr. Fry into her RFC and hypothetical question is without merit; the court has already determined that the ALJ permissibly discounted the opinions from those two sources.

Finally, Widlund contends that the ALJ erred by failing to include in her RFC, or discuss in her decision, Dr. Coyle's summary conclusions that she "had moderate difficulties in maintaining concentration, persistence, or pace."  Cl.'s Mem. of Law (doc. no. 8-1), at 21.  The second half of that argument is plainly incorrect; the ALJ did discuss Dr. Coyle's determination that Widlund had "limitations in social interaction as well as sustaining attention and concentration" in her decision.  Tr. 16.  On the other hand, the first half of Widlund's argument has

at least a hint of merit; the ALJ did miss a beat in fashioning
her RFC and framing her hypothetical question to the ALJ.
Specifically, while the ALJ's RFC closely tracks the narrative
functional capacity assessment in Dr. Coyle's Mental RFC
Assessment form, it left out this finding:

> Cl[aiman]t can sustain att[entio]n/conc[entration] for
> routine tasks of a nonsocial nature and maintain
> effort for extended periods of time over the course of
> a normal work day/week within acceptable pace and
> persistence standards.

Tr. 583.  It is evident that the ALJ inadvertently left that
limitation out of her RFC and hypothetical question.  But, under
the circumstances of this case, that oversight does not entitle
Widlund to a remand.

Widlund's argument would have some force if she were able
to demonstrate that the omitted limitation, if presented to the
VE, would have led the VE to testify that the person described
in the hypothetical question was unemployable.  Widlund does not
even attempt to make such an argument and, indeed, no such
argument is sustainable.  First of all, the limiting quality
embedded in the ability to sustain attention/concentration for
routine tasks of a nonsocial nature is captured in a limitation
the ALJ did incorporate into her hypothetical question: "Can
participate in typical interactions with co-workers and
supervisors, while completing routine tasks of a non-social
nature . . . ."  Tr. 55.  And, the rest of the omitted

limitation is no limitation at all, because it is impossible to see how the ability to "maintain effort for extended periods of time over the course of a normal work day/week within acceptable pace and persistence standards," Tr. 583, could ever diminish a person's employability.  Accordingly, the ALJ's failure to faithfully recite Dr. Coyle's functional capacity assessment in her hypothetical question to the VE is not a reversible error.

The ALJ's RFC is supported by substantial evidence, and the ALJ's hypothetical question to the VE was based on a properly supported RFC.  While the record may have supported a more restrictive RFC, i.e., one more favorable to Widlund's claim, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka, 842 F.2d at 535.  Because the ALJ's RFC is supported by substantial evidence, the court must uphold it.

## Conclusion

The ALJ has committed neither a legal nor a factual error in evaluating Widlund's claim.  For that reason, I recommend that: (1) Widlund's motion for an order reversing the Commissioner's decision, document no. 8, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 9, be granted.  See Manso-Pizarro, 76 F.3d at 16.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 181 L. Ed. 2d 268 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

April 16, 2012

cc: Elizabeth R. Jones, Esq.
    T. David Plourde, Esq.